cases this morning but we also have a timetable so when your yellow lights come on during argument we ask you to wind down. Your presentation in the red light means you need to stop speaking unless the court has a question for you. We are also familiar with the briefs and record excerpts. We have not necessarily read the record and we appreciate record citations when those are applicable. With that we call the first case of the morning number 23-10802 Paxton v. Duttlebach. We'll hear first from Mr. MacDonald. Good morning. May it please the court. My name is Tony MacDonald. I'm here on behalf of the individual plaintiffs and Mr. Eldred will be up to talk to the state's interest in the second half of this presentation. I'm joined by Mr. Martin, Tracy Martin, who is one of the three individual plaintiffs in this case. They've testified that they wish to make a simple noise suppression device in their own homes with their own skill, with their own materials but unlike the mufflers that are attached to our cars and our lawnmowers they want to attach this device to their firearms. Mr. Martin would tell you that he believes every home defense weapon should be suppressed, not only because it protects the shooter's hearing but it makes them more attuned to the threat, to know when the threat is eliminated. The plaintiffs here seek to make these devices, they wish to make these and it's not disputed if they were to go home and make these devices without seeking the federal government's permission, without registering the devices, without serializing the devices and without paying a $200 tax, if granted permission to make the devices, it's undisputed that they would face 10 years in prison. Mr. Martin could leave here today and he could proceed with this course of conduct to make these devices without seeking the federal government's permission and he would face 10 years in prison, that's not disputed. The Springport and Babbitt has told us that a course of conduct, when a plaintiff proposes a course of conduct that is arguably affected with a constitutional interest, that is prescribed by statute and where there is a reasonable fear, here there's not just a fear but a confidence that there would be a prosecution, that those plaintiffs are not required to break the law in order to test the law. They're not required to break it but the reality is they've got to do more than just wish, they've got to do more than express some ephemeral desire to do something that might run afoul of the law. What do you have in the case besides their declarations? So I would challenge the premise slightly, I don't disagree with you. What we have is sworn declaration testimony that these plaintiffs wish to proceed in the course of conduct that's prescribed by the law. Well how far do they have to go? If this were a First Amendment case and the plaintiffs wanted to parade without a permit, I assume that a declaration only would have to say we're planning to parade and we think a permit is unconstitutional so we're not going to apply for one. Would that be sufficient? Well that would be and I will say the First Amendment context there's relaxed standing, that's not clear in the Second Amendment context. But what Babbitt tells us is that there's a general rule which says you propose a course of conduct that's prescribed by law, that's subject to a reasonable threat of prosecution. Then the court looks at instances where that proposed course of conduct is imaginary or speculative and so that's how we take care of cases in which there are contingent things that might happen or might need to happen in order for there to be standing. Here there's no contingent thing. Mr. Martin, like I said, could leave here and could travel to his home and begin the process of making a firearm suppressor. Well look, you have limited time and we understand that but the number of it to me is do they have to allege precise facts about I've already bought a 3D processor or I already have metal working equipment, I have the knowledge, I know where I'm going to buy my supplies for how much would suffice, number one. Number two, if you are challenging the regulatory regime, our court just issued an opinion, a couple of opinions that say that being exposed to a regulatory regime that is arguably unconstitutional is injury. That's right and I think you're right. A plaintiff is found to have standing to challenge an administrative regime that they say is unconstitutional. They don't necessarily have to go through that process in order to do so. So I think that is instructive, although obviously a bit different in this context. To your question about a proposed course of conduct, the plaintiffs have alleged that they intend to do this action, which is really quite a simple action, in their own homes with their own materials. There has really been no factual dispute about that and we actually were working to develop a factual record in the trial court and the trial court said we don't think discovery is needed. So to the extent that there was a dispute to say well these plaintiffs are not capable of doing this relatively simple thing, that's something that really should have been developed in the factual record. There's nothing more that these plaintiffs could do other than say in a sworn testimony, in a sworn declaration, sending that to the Attorney General's office, hiring an attorney and bringing a lawsuit to say I intend to engage in this course of conduct. Well right now you are also challenging the regs that say we want photos of every single component right and not just the tax but we want basically all your background information so you can file an application that we may or may not grant and if we don't grant it we may, because you've sent us incriminating information, we may prosecute you, right? And that is a factor. Is that part of the basis for your claim of standing? I don't think it's necessary but it is helpful. The unique circumstances here show additional reasons why they're standing so to add to that, there's an application process but what we have alleged in this lawsuit is that that application process is being used to abusive ends. Some applicants are being made to wait indefinite periods of time that the ATF has been asking for. Well we can't, I mean how could we adjudicate that unless you had actually applied? I disagree. I think the question is, is this process applied to this exercise of this right? What do you do with the case law that says silencers are not protected under the Second Amendment because they're not firearms? Well I think it's premature for this court to reach that question but I think it's wrong. There's case law to that effect, correct? There's district court cases, non-binding cases but the U.S. Supreme Court has told us in Heller, in Bruin, they describe arms as articles, modern instruments that facilitate self-defense. It's a very broad definition for what an arm would be. Well we're going to find out what they say about Bruin I guess shortly in Rahimi but still you've got the, where's the case law that says a silencer is protected under the Second Amendment? There is no case that says a suppressor silencer is an arm. That's a question that I think ultimately may get to this court. I don't think it's primed for you to rule on that today. I think that's to the merits of this case as opposed to whether we have standing but these are the answers that this case is meant to provide and these are the questions that we are trying to ask the trial court to answer. Okay. You have a chance, well thank you. Mr. Eldred? Thank you, Justice Jones. May it please the court, I'm Charles Eldred from the State of Texas. As applied to citizens making firearms suppressors for non-commercial personal use in Texas, the challenge statutes and rules affect Texas' quasi-sovereign interests and therefore Texas has standing also to pursue this case. According to the Alfred L. Snapp opinion, quasi-sovereign interests consist of interests the state has in the well-being of its populace. They also say it's a quasi-sovereign interest in the health and well-being, both physical and economic, of its residents in general. And importantly, this is an interest apart from the interest of the particular private parties. So this is not a parent's patriotic case. The Mellon bar does not apply. Mellon v. Massachusetts, as recognized in the Mellon bar, is not a case about quasi-sovereign interests. Quasi-sovereign interests are the kind of things that states can bring on their own behalf, again to vindicate the health and being, both physical and economic, of its citizens, I'm sorry, of its residents in general. Let me ask you, does section 2.052A of the Texas Code, does it do anything beyond exempt the suppressors made in Texas from federal law? I don't have it in front of me, but I don't think the law, what the statute is intended to do is not to let, say, a citizen make the suppressor and then go to federal court and say, ha-ha, I've got this law, and so I don't have to do it. It does not exempt citizens from the operation of federal law. It sets up a sovereign interest in Texas's, Texas has a sovereign interest in having citizens make these things, and this is what the law does, and it tells the Attorney General to come here, come to court, and try to vindicate that sovereign interest. What is the sovereign interest? Sovereign interest is Texas's interest in having its citizens be able to make suppressors for non-commercial personal use for self-defense. How is that a state sovereign interest? It's proceeding under the theory that Texas can enforce its code. I wouldn't put it that way. Are you not proceeding under that theory? Am I proceeding under the theory that Texas . . . well, the code doesn't do anything other than order the Attorney General to file a lawsuit. Well, that's sort of what I'm getting at. Back to Judge Clement's question, I mean, I'm struggling to find what sovereign interest Texas has that's distinct from the individual plaintiff's alleged interest in rights. Well, two answers. The quasi-sovereign interest is defined as . . . The quasi-sovereign is different than sovereign. I'm trying to get at what the sovereign interest of the state is. That's the sovereign interest to create and enforce a legal code, yes. But you basically have said that the legal code here just says we're contrary to federal law, and the Attorney General needs to bring this action. It does say that. That's true. It does set up a clash of sovereigns, though. We say . . . the statute says, our legislature says, that we don't think the federal law is constitutional, and they want this Attorney General to do something about it. Yeah, but the state can't set up a clash of sovereigns by passing a law that says we disagree with federal law. There are cases out there that say that the state can't pass a law, can't create a sovereign interest just by saying, hey, citizens, you don't have to comply with federal law. I agree with that. I just don't think that's what Chapter 2 does. What else does it do? It tells us . . . it sets up a . . . this very lawsuit, which is a different thing than just saying citizens don't have to comply with law. Chapter 2 does not say citizens don't have to comply with the law. We can set up a lawsuit to allow the state to come in and say citizens don't have to comply with federal law. That's what Chapter 2 does, yes, Your Honor. I think we're completing the circle. What about quasi-sovereign interest? How are the state's quasi-sovereign interest here distinct from what the citizens would bring as individual claims? They're distinct mainly because the Supreme Court has defined them as distinct. But no, no, I think the state has to articulate some distinct quasi-sovereign interest in order to proceed as a plaintiff. Does it not? Well, I think we have. It's the interest in the health and safety of our citizens. But how is . . . I mean, you can't just generally say that and proceed to intervene as a plaintiff or stand up as a plaintiff in the lawsuit. How are the quasi-sovereign interest of the state of Texas affected distinct from what the individual claims are? Well, because it's just . . . I don't know how else to say it. It's just defined as the state's interest. The interests are similar. They overlap a lot. The citizen has an interest in his own health and safety, but also the state has a separate interest in the citizen's health and safety according to the law. Yes, but that doesn't give the state the ability to intervene in every case where a plaintiff's health and safety are implicated, does it? Every case? I don't think so, no. What's your best case to support standing here? Probably Massachusetts v. EPA, which they said was a quasi-sovereign interest case. That's the case, of course, that kind of set us up down this path of all these lawsuits being brought. I do want to say one thing about . . . What do you do about Missouri v. Biden? Didn't I cut back on Mass v. EPA? Isn't that the one? Well, I get them all confused now, but it was the one about immigrants, about the requirement of the federal . . . the alleged requirement of the federal government that it shall remove criminal aliens. Oh, that's part of the prioritization case. In that case, they found we had no standing because there is no standing ever to order the federal government to arrest people. The federal government has authority or discretion to arrest people or not. So that wasn't a direct challenge to Mass v. EPA? No, I don't think it was a direct challenge to that. If I can squeeze in a little bit about the Anti-Injunction Act, I will acknowledge that our reply brief is incorrect when we say it's not before you. The other side raised it. But it's not supported by the record. I see my time is up. Okay, you have a chance for rebuttal. Mr. Janda? Thank you, Your Honor, and may it please the Court. Sean Janda for the Federal Government. The District Court correctly held that no plaintiff has established standing to challenge the NFA's restrictions on making silencers and dismissed plaintiff's complaint without prejudice. This Court should affirm. I suppose what would it take for plaintiffs to have standing to challenge? I mean, I don't understand how the government can promulgate a regulation that says, show us photos of all the stuff you're going to use, and if in our discretion we deny you a license, the FBI is going to be at your door tomorrow. In other words, how can the government require self-incrimination, potential self-incrimination as a basis for regulation? So I think that's just absolutely not what's happening here. It's not, but it could. It could not, and here's why. 26 U.S.C. 5822, which we cite in our brief, says that no information that is provided in an application under the NFA can be used directly or indirectly in any sort of federal criminal proceeding. It's in the database, isn't it? I'm not sure what happens with an application that's denied, but the statute makes it very, very clear that the government cannot use that information to prosecute. Well, the government couldn't target conservative organizations, but the IRS did. The government couldn't target other specific people, but it happens. The question is, could they file an incomplete application? Could they file an application, have it denied, and would they have standing then? Yes, they would absolutely have standing if they filed. If they gave a more detailed declaration where they described what they intended to get, maybe identified the components a little more detail. I mean, where is the line after which they have standing to challenge these regulations? So I think the very easy case would be if they applied and had the application denied or granted and they paid the tax. Well, if you just sit on it for the next two years, of course, then the right, I mean, their ability is thwarted, so. I mean, I think at the point that they've submitted the application, if they think it's been constructively denied or they think there's a problem with the delay because they think they have a Second Amendment right to not have to go through the process, I think at that point they would have standing and there might be other threshold problems, but they would certainly have standing. But at this point, they haven't submitted an application, and even to turn to the declarations, I think the declarations in this case are just the absolute bare minimum that you could possibly have. They say that the plaintiffs intend to make a silencer, and there's just no additional details. And so I think the sorts of things that this Court identified in Barber would be the sorts of things that the plaintiffs would want to put in a declaration that would get them closer to that line. So any concrete steps they've taken, you know, for example, they say that they have some intent to make the silencer with components made only in Texas. If they went on to say, you know, we've taken the steps to identify particular components that we know are made only in Texas, and these are the ones that we sort of have purchased or would like to purchase or would purchase if we were to win this lawsuit, I think that would help them a lot. If they had any additional information about the silencer design that they would like to make, the tools that they have that would permit them to make the silencer, any sort of training or experience. Are you conceding that these — that allegations of these facts would be sufficient such that if they file another lawsuit, the government will concede standing? I don't think I'm in a position to say that any specific alleged fact would be enough. I think you — the Court really would have to look in any future lawsuit at the constellation facts. No, but, you know, we keep records, too. And you do concede that there are these kinds of facts that would certainly be sufficient for standing. I think each of those facts and declaration would get them closer. I don't know exactly where the line would be. If they filed an application, like, they would have standing 100 percent. Do you agree they don't have to do anything to violate the law before they have standing for a pre-enforcement challenge? Correct. If they file an application, if they provide the information in the application, and if it's denied or if it's granted, they have standing. So what would sustain a pre-enforcement challenge in your mind? So I think in the NFA context in particular, it's a little bit tricky. I mean, this Court's cases, and I think Westfall is the most complete on this, I think impose a pretty high requirement here because there's no risk of having to violate the law to bring the challenge, which is sort of the basis for the exception to the normal rule that you have to be injured before you can sue. And in this context, you just — you can establish standing without ever violating the law, and you can bring all your challenges at that point. And so I think, you know, Westfall read to its extremes. It might say really the application is required, and no amount of additional concrete steps would be enough short of filing the application, which, again, doesn't violate the law, would not expose anyone to prosecution. No. Well, you've got to have photos. You don't have to have photos. The relevant statute says you have to describe the firearm. In some cases, ATF has asked for additional information to help it make the determination it needs to make about whether making the firearm will put you in violation of Federal law. So at that juncture, wouldn't the plaintiffs then have standing to come in and say, we applied for this, we don't think we have to violate the law, we have been injured, and we have standing? Yes, absolutely. If they got — if they applied, if they got that follow-up request, if they didn't want to comply with the follow-up request. And that would be sufficient at the summary judgment stage? Yes. I think having filed the application, they would have standing. There might, as I said, be other problems, and I think the Tax Anti-Injunction Act might cause them difficulty if they didn't actually wait for a decision on the application. But I don't think that would be a standing problem. As soon as they filed the application, I think — we think they would have standing. And again, as I said, we read this Court's cases as really thinking or saying that the application is required in the NFA context. But I think even outside that special context, I think Barber is a really good example of the sorts of things that the Court would usually look for, just none of which are present in this case. So any of those additional facts, I think, would certainly help the plaintiffs. And as I said, the district court dismissed the complaint without prejudice. There would certainly be no procedural barrier to them refiling the complaint, including additional declarations, evidence of the sort that we've been talking about. And then if the Court has no other questions about the individual plaintiffs, I think just turning really briefly to Texas's independent asserted claim to standing, I think the fundamental principle that we divine from the Supreme Court's cases is that a state cannot bring a lawsuit against the federal government if the state is really asserting the interest of its citizens. And here, I think that Texas is just saying that they would like to assert their interests. What was the interest asserted in Massachusetts v. EPA? So there were two interests, Your Honor. I mean, one, the substantive interest was that — I mean, Massachusetts' view, part of the — The water was going to rise. Right. I mean, part of the state was going to be submerged. I mean, that's a — Which, of course, 30 years after the fact is demonstrably untrue, but that was good enough for a hypothesis, right? I mean, I think the interest there or the claimed injury there — I mean, whether or not that injury was borne out or not, I don't know — but the claimed injury was that part of the state was going to be submerged. I mean, I think that's a pretty core territorial — Well, tell the Obamas that. And then, I think the other thing, Your Honor, is that there was also a procedural component to the interest there, which was that Massachusetts had filed a rulemaking petition in that capacity to vindicate that substantive interest, and that rulemaking petition had been denied. And so here, there's just none of that. And I think that the footnote that they rely on in Massachusetts says very clearly — it may be the only very clear thing in that footnote — is that a state cannot sue to assert its citizen's interest in avoiding the operation of federal law. And that's just exactly what Texas is doing here. They think their citizens, in this context, shouldn't have to comply with the NFA. And again, whether they're right or wrong about that, that's a claim for their citizens to bring and not a claim that they get to bring on behalf of their citizens. And then just, I think, the final piece of it is, I don't think, enacting a state statute that sort of codifies the litigating position that — Well, what about all the cities that pass laws, or states even, proclaiming themselves sanctuaries? I mean, I think you can pass whatever law you want. I mean, we don't have any problem with Texas choosing to codify its litigating position. I'm not sure that — Well, they all litigated against the government, and some of them did during the last administration. My memory, Your Honor — and I'm not 100 percent sure about this, so with that caveat — my memory is that in that litigation, there were grants that the federal government tied to cooperation with federal immigration enforcement, and that was really the underlying interest. And so, it wasn't just sort of the bare interest in proclaiming a disagreement with federal law, which I think is all we have here. I mean, the NFA, in relevant part, doesn't require Texas to do anything. It doesn't regulate Texas. And so, you know, Texas can pass the statute, but I don't think they can leverage the statute to create standing where none would have existed otherwise. So if there are no other questions, we will ask that the Court affirm. Thank you. Okay. Mr. Eldred? Thank you. Just a few things. I believe the ACF's position is that they can use the information that is provided to deny the application. So if you send them pictures of your parts of a suppressor, they can say, you're already violating the law because you already own a suppressor, because the parts of the suppressor are defined as a suppressor under the law. So if you send the pictures of parts — But if plaintiffs have that fear and they make the application and they don't send a picture of the parts, they've applied for a silencer, they could even state on the application, we're not sending pictures because we don't want to run afoul of the law, and then when the government denies the application, have they not then suffered an injury? I agree with that. The counsel opposite just said they would. There wouldn't even be a dispute about standing if they just filed that application I just described. I agree. I think we agree with that one. But we do think that the application itself is the injury. I mean, imagine if you had to apply to discuss the election in your own home. This is different than the parade example. This is a — But you just — I mean, I think you just gave away the game. Did you not? The application is the injury. The application is not legal or illegal, and filling out an application is not legal or illegal. It doesn't subject you to any criminal penalties, but it does subject you to an injury because you've got to have filled it out. But they haven't done that here. No injury, no standing. Well, we're saying that this is a case where you can sue before there's an injury. I understand pre-enforcement, but still, you have to have some threat of injury or something that's substantiated before you can just come in and say, well, we'd like to do this, and so therefore we're going to sue. One of the — our count one is we want to be able to make firearm suppressors in our own home for noncommercial personal use without doing the application, and that's the difference, I think. It's similar to what I was about to say about needing to apply for permission to speak about the election in your own house to your own family members. That's — this is a — if that was a law that said you had to do that, it would be easy to say there was standing, but you don't have to apply for permission to speak. Second Amendment law, of course, is developed because Bruin's pretty new, but that's, we think, the same issue. If you have to apply to make a suppressor in your own home, again, for noncommercial personal use, no — not even to take out of the state. They have to stay in the state, we think, is what the statute says. That is very similar, I think, to applying for permission to speak in your own home, because there's no other — there's no time, manner, or place restriction. I can't — there's no imaginable reason why the government can do that if you have a right to bear arms. What's the — well, and that's — what is the statutory and constitutional basis for the challenge to the regulation? It assumes standing. What is your claim? What is the plaintiff's claim? Does regulation violate the APA? Does it violate the Constitution? What's alleged? The Constitution, and also the rules violate the APA. The APA. And these are procedural rules, because you — they're licensing rules, so it's a procedural regime. To that extent, yes, they are procedural rules, and that's been defined as a quasi-sovereign interest as well. Texas is interested in challenging procedural rules. Well, and the plaintiffs have — again, we do have cases that say that being subjected to an illegal regulatory procedural regime is injury-sufficient for standing. Yes, and we're saying that, too. And — What's your best case for that? Exxon, I think. Oh, A-X-O-N? Yes. Okay. If I'm pronouncing it correct. All right. Just one more thing on the sovereign interest. The statute, we would say — a better answer to what I should have said before. It promotes firearm suppression — it promotes the building of firearm suppression, so the making of firearm suppressors, by citizens for their own use. That's the sovereign interest that it implements, and I think there's no other questions. I'm done. Okay. I think we have your argument. Thank you.